**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

| | | |
|---|---|---|
| **PAUL HARKER** | : | **CASE NO.:  1:17CV00830** |
| | : | |
| **Plaintiff,** | : | **Judge Susan Dlott** |
| | : | |
| **v.** | : | **Magistrate Judge Karen Litkovitz** |
| | : | |
| **MIAMI UNIVERSITY, et al.** | : | **FIRST AMENDED COMPLAINT** |
| | : | |
| **Defendants.** | : | **JURY TRIAL REQUESTED** |

---

## I.  PRELIMINARY STATEMENT

1.      Plaintiff Paul Harker is a former offensive lineman who played varsity football for Michigan State University.  After a successful collegiate football career, Mr. Harker eventually became a strength and conditioning coach at Miami University.  Mr. Harker's wife gave birth to twins in January 2017 and he took FMLA leave.  This infuriated Miami's head football coach, Chuck Martin, who complained that every other man who had ever worked for him was back at work the next day after his wife gave birth and told Mr. Harker he needed to decide whether he was a football coach or a family man.  Within a few days after returning from FMLA leave, Mr. Harker was told to quickly find a job elsewhere because it had been decided that his contract at Miami would not be renewed.  Mr. Harker now seeks back pay, front pay, liquidated damages, punitive damages, attorney fees and all other remedies available under applicable law.

2.      Plaintiff timely files this Amended Complaint as a matter of right pursuant to Fed. R. Civ. P. 15(a)(1)(B).

## II.  JURISDICTION

3.      Jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1331.  Federal jurisdiction is appropriate in this case to secure protection under and redress deprivations of rights

conferred by the federal Family and Medical Leave Act 29 U.S.C. § 2601, *et seq*. ("FMLA") and

Title VII of the Civil Rights Act of 1964, as amended 42 U.S.C. § 2000e, *et seq.* (Title VII).

4.      Venue with this Court is appropriate because the actions out of which these claims

arise occurred within the Southern District of Ohio.

### III.  PARTIES

5.      Plaintiff Paul Harker was at all relevant times a resident of Butler County, Ohio.

Mr. Harker was at all relevant times an "eligible employee" under the FMLA pursuant to 29 U.S.C.

§ 2611(2)(A).

6.      Defendant Miami University ("Miami" or the "University") is a public university

located in Butler County, Ohio.  Miami is an employer subject to the FMLA pursuant to 29 U.S.C.

§ 2611(4)(A).  Miami is an employer subject to Title VII pursuant to 42 U.S.C. § 2000e(b).

7.      Defendant Chuck Martin ("Coach Martin") is and was at all relevant times the head

football coach for the Miami Men's Varsity Football team.  Defendant Martin is an employer as

that term is defined by the FMLA under 29 U.S.C. § 2611(4)(A)(ii)(I).[1]  Defendant Martin is sued

in his individual capacity.

8.      Defendant David Sayler is and was at all relevant times the Athletic Director at

defendant Miami University.  Defendant Sayler is an employer as that term is defined by the

FMLA under 29 U.S.C. § 2611(4)(A)(ii)(I).  Defendant Sayler is sued in his individual capacity.

9.      Defendant Steven Brockelbank is and was at all relevant times the Associate

Athletic Director for Communications and Administration at defendant Miami University.

---

[1] Plaintiff acknowledges the Sixth Circuit's holding in *Mitchell v. Chapman*, 343 F.3d 811, 832 (6th Cir.2003), that individual employees of public employers are not "employers" under the FMLA.  Defendant Martin and the other individual defendants are named in their individual capacities to preserve the issue in view of the clear circuit split on this issue in which the Sixth Circuit represents the minority view.  *See e.g. Aguirre v. California*, 2017 WL 5495953, *6-8, 2017 Wage & Hour Cas.2d (BNA) 412,319 (N.D. Cal. November 16, 2017) (noting the clear circuit split and majority view that individual public employees may be liable as employers under the FMLA).

2

Defendant Brockelbank is an employer as that term is defined by the FMLA under 29 U.S.C. § 2611(4)(A)(ii)(I).  Defendant Brockelbank is sued in his individual capacity.

10.     Defendants John/Jane Does 1-10 are individuals whose identities are not currently known but who may be discovered to have violated one or more of plaintiff's rights including those guaranteed by the FMLA.

## IV.  FACTS

11.     Mr. Harker played varsity football at Michigan State University where he served as team captain for the 2002-2003 season.  Mr. Harker holds an undergraduate degree in communications and a master's degree in kinesiology, both from Michigan State University.

12.     Mr. Harker holds the strength and conditioning coach certifications required by the NCAA for all Division I strength and conditioning coaches.

13.     From 2006 until 2011, Mr. Harker worked for Wayne State University as the head strength and conditioning Coach.  In 2010, Mr. Harker was promoted to Assistant Athletic Director at Wayne State University.

14.     In February 2011, Miami hired Mr. Harker as the Director of Athletic Conditioning.

15.     Mr. Harker's position with Miami was at all times unclassified.  Each of Mr. Harker's contracts with Miami, including his final contract which ended effective June 30, 2017, was an annual contract for one year.  Under Miami's written policy, specifically MUPIM 13.4.A., Mr. Harker's position was an annual appointment.  As such, Mr. Harker's employment was subject to non-renewal upon the expiration of each annual contract.

16.     From 2011 to 2016, Mr. Harker received performance evaluations that met or exceeded expectations for his position.  Indeed, in 2014 the Deputy Athletic Director wrote on Mr. Harker's evaluation that "Paul does a terrific job for our entire department," and in 2015

3

Mr. Harker's reviewers noted that "[y]ou have done an excellent job with football and Coach Martin frequently states and shares that information."

17.     Mr. Harker and his wife had their first child in October 2014.

18.     In 2016, Mr. Harker's wife became pregnant with twins which were due in or around January 2017.

19.     On or about December 1, 2016, Mr. Harker approached Coach Martin and Matt Yoches (Director of Football Operations) and requested permission not to travel with the football team to a bowl game in St. Petersburg, Florida on December 26, 2016, because his wife was 35 weeks pregnant, unable to travel, and at risk for early delivery.

20.     Coach Martin and Mr. Yoches approved Mr. Harker's request and expressed support.

21.     In December 2016 and January 2017, Mr. Harker had conversations with Mr. Yoches and Mr. Brockelbank about his intent to take time off after his wife gave birth to the twins.  At the same time, he was preparing his staff for his forthcoming absence.

22.     On or about January 11, 2017, Mr. Harker received a letter from Miami regarding the change in his title to Director of Strength and Conditioning for the Athletic Performance Center.  This was a change of title and did not affect Mr. Harker's pay.  Mr. Harker was advised that this change was due to the University's addition of the facility known as the Athletic Performance Center.  Mr. Harker was advised by Assistant Athletic Director Steven Brockelbank that he would be reporting to Coach Martin.

23.     On January 20, 2017, Mr. Harker's wife gave birth to twins.  Members of the coaching staff were aware that Mr. Harker was in the hospital with his wife on January 20, 2017, and Mr. Harker notified Mr. Yoches and Mr. Brockelbank via text message on January 20 and 21,

2017, respectively.

24.     Mr. Harker's wife and newborn twins were hospitalized until January 23, 2017.

25.     On January 23, 2017, while still in the hospital with his wife and newborn twins, Coach Martin texted Mr. Harker to ask where he was.

26.     The next day, January 24, 2017, Mr. Harker met with Steven Brockelbank to discuss his use of FMLA leave, including the three full weeks of paid leave provided by Miami. Mr. Brockelbank directed Mr. Harker to the Department of Human Resources.

27.     Mr. Harker completed the necessary paperwork to request leave to help care for his wife and newborn children pursuant to the FMLA's "Family-Care" provision (i.e. 29 U.S.C. §§ 2612(a)(1)(A)-(C)), and his leave was approved from January 20, 2017 through February 9, 2017. A copy of the letter approving Mr. Harker's leave and directing him to denote it as FMLA leave is attached as Exhibit A.

28.     Mr. Harker continued to support Miami while on leave.  For example, on January 28, 2017, he participated in Miami's recruiting efforts by giving presentations to two groups of recruits and parents.

29.     On or about February 2, 2017, while Mr. Harker was on FMLA leave, Coach Martin left Mr. Harker a voicemail stating that they needed to discuss "Mr. Harker's future with the program."  The following day Coach Martin called Mr. Harker again, upset Mr. Harker had not yet contacted him.

30.     On or about February 2, 2017, Coach Martin also sent Mr. Harker a text message that read, in part, "we obviously need to have a long discussion about your future plans…we need to sit down and discuss what your plans our [sic.]…We need to talk asap!!!!."

31.     Mr. Harker followed up with Coach Martin and they met on or about February 7,

2017.  Coach Martin said Mr. Harker's future with Miami was in jeopardy because of Mr. Harker's

non-commitment to the program including Mr. Harker not travelling to the game in St. Petersburg,

Florida (which Coach Martin and Mr. Yoches had previously approved) and Mr. Harker not being

present during his FMLA leave, which Coach Martin referred to as "maternity leave."

32.     Coach Martin told Mr. Harker there was not another man on his staff who did not

return to work the day after the birth of a child.  Coach Martin then questioned Mr. Harker on

whether he wanted to be a "football coach" or a "family man."  Coach Martin told Mr. Harker that

he would be speaking with the Athletic Director to decide the future of Mr. Harker's employment

with Miami.

33.     Coach Martin's statements manifest retaliatory animus towards Mr. Harker for

Mr. Harker's use of FMLA leave as well as antiquated and unlawful gender stereotyping in

employment decisions to the effect that taking time to care for family members and newborn

children should be done by women rather than men.

34.     Upon information and belief, Coach Martin then met with Steven Brockelbank,

David Sayler and others to implement a process to end Mr. Harker's employment at Miami.  Upon

further information and belief based on internal e-mails, Mr. Brockelbank then met with the

Department of Human Resources to discuss the nonrenewal of Mr. Harker's contract and the terms

required by Miami's policies.  (See copy of February 17, 2017 e-mail from Steven Brockelbank to

Kristin Henegar in Miami's human resources office referencing meeting regarding nonrenewal of

Paul Harker attached as Exhibit B.)

35.     On or about February 13, 2017, Mr. Harker returned to work from his FMLA leave

and resumed his duties.

36.     On February 17, 2017, Mr. Harker met with Coach Martin.  Coach Martin told

Mr. Harker that he had met with Miami's Athletic Director, defendant Sayler, and the decision had been made to non-renew Mr. Harker's contract when it expired. Coach Martin told Mr. Harker to find another job quickly so his replacement could be hired. Coach Martin said he was being told to "make things uncomfortable" for Mr. Harker so he would just resign rather than finish out his contract.

37.     Based on this communication from his immediate supervisor, with the approval of the Athletic Director, Mr. Harker understood that his employment with Miami would be ending upon the expiration of his contract. Thus, on February 17, 2017, Coach Martin notified Mr. Harker of the termination of his employment with Miami effective June 30, 2017.

38.     The decision to terminate Mr. Harker's employment was made knowingly and with malicious intent to retaliate against Mr. Harker for exercising his federally protected right to leave under the FMLA's "Family-Care" provision (i.e., 29 U.S.C. §§ 2612(a)(1)(A)-(C)). Upon information and belief, this decision was made by defendants Martin, Sayler and Brockelbank, and potentially others.

39.     Mr. Harker was deeply upset by the decision to end his employment with Miami. As Coach Martin directed him, Mr. Harker began searching for another job. Expecting that he would need to move to find work, Mr. Harker put his home on the market.

40.     Despite the treatment to which he had been subjected, Mr. Harker continued to perform his duties at Miami after returning from FMLA leave. During this time, Coach Martin inquired several times whether Mr. Harker had found another job and continued to urge him to find something quickly.

41.     On March 31, 2017, Mr. Harker met with Coach Martin. During the meeting, Mr. Harker informed Coach Martin that he was eligible for an additional nine weeks of FMLA

leave to care for his newborn children and that he would like to utilize that leave.

42.     Later the same day, Coach Martin approached Mr. Harker and said that he and Mr. Brockelbank had talked and decided they would not "fight" Mr. Harker on his request for an additional nine weeks of FMLA leave if Mr. Harker would resign his position effective June 30, 2017.  Coach Martin told Mr. Harker that, if he submitted the requested resignation, he could use Coach Martin as a reference in his job search.

43.     Coach Martin's desire to condition Mr. Harker's request for FMLA leave on the submission of his resignation reflects a profound misunderstanding of employee rights under the FMLA, evinces hostility to the exercise of those rights, and confirms his efforts to end Mr. Harker's employment with Miami.

44.     Mr. Harker objected to the idea of resigning because it would wrongly indicate that his employment ended voluntarily and would preclude him from collecting unemployment if he was unable to find another job when his contract ended.  Mr. Harker also objected to the idea of resigning because he believed he was entitled to FMLA leave under federal law.

45.     Mr. Harker did not resign as requested by Coach Martin, and he applied for FMLA leave to care for his newborn children through Miami's human resources office.  On April 3, 2017, Miami approved Mr. Harker's request for FMLA leave from April 3, 2017 until June 4, 2017.

46.     A few days later, on April 6, 2017, Mr. Brockelbank requested review of Mr. Harker's employment for non-renewal due to "lack of commitment and communication."  See copy of e-mail attached as Exhibit C.

47.     On April 7, 2017, Kristin Henegar, Human Resources Generalist, e-mailed Mr. Brockelbank to inform him that his notes in support of Mr. Harker's non-renewal were "thorough enough" and that she would be meeting with Miami's Director of Employment before

providing him with a letter to use with Mr. Harker.  See Exhibit D attached.

48.     Upon information and belief, in the weeks that followed, Miami's Human Resources Department met with Mr. Brockelbank and Miami's legal counsel to manufacture what would appear to be a legitimate, lawful reason to terminate Mr. Harker's employment to attempt to cover up and avoid the unlawful and retaliatory decision communicated to Mr. Harker on February 17, 2017.  Indeed, e-mails confirm that on May 2, 2017, while Mr. Harker was on approved FMLA leave to care for his newborn children, Mr. Brockelbank told Miami's HR Department that the Athletic Department "absolutely want[s] to move forward with a termination" as to Mr. Harker, and HR personnel were instructed to consult counsel "to make sure they choose the right timing, etc."  See Exhibit E attached.

49.     During Mr. Harker's FMLA leave, Coach Martin told staff and athletes that Mr. Harker was "having family problems" and that he would not be returning to Miami.

50.     On or about June 5, 2017, Mr. Harker returned to work at Miami to finish the term of his contract, which would end on June 30, 2017.  Mr. Harker had received no communication from Coach Martin, Mr. Brockelbank or anyone else with Miami about his employment status while he was off on leave.  As a result, Mr. Harker understood that his employment would end on June 30, 2017, as Coach Martin had told him it would in February.

51.     Based on this understanding, Mr. Harker sold his home in Oxford, Ohio prior to returning to work from FMLA leave and entered into a contract to purchase a home in Michigan where he was working on potential leads for new employment and where his wife's family lived and would be available to assist his family of five with child care.

52.     On June 5, 2017, Mr. Harker told Coach Martin that he had sold his house and agreed to buy a new one in Michigan because in February Coach Martin had told him he was going

9

to be non-renewed. Coach Martin told Mr. Harker that he still intended to secure Mr. Harker's termination and was working on a plan to do so, and then told Mr. Harker to go home.

53.     Upon information and belief, upon learning that Mr. Harker had sold his home and made plans to move based on the non-renewal decision communicated to him in February – which had never been retracted – Coach Martin, Mr. Brockelbank, Miami's HR department, legal counsel and/or others undertook to try to avoid liability for their unlawful discrimination and retaliation against Mr. Harker by pretending as if he had not been told he would be non-renewed and told to find another job so he could be replaced. They did so knowing that it would be difficult or impossible for Mr. Harker to undo the damage that had already been done because he had sold his home, made plans to move and signed a contract and put down a deposit to purchase a new home in Michigan.

54.     On June 7, 2017, Mr. Brockelbank summoned Mr. Harker to a meeting to hand him an "Expectations Letter" laying out new requirements for Mr. Harker's position at Miami. Mr. Harker expressed surprise because, as Mr. Brockelbank knew, Mr. Harker had been told he would be non-renewed and to find another job. Mr. Harker explained that he never would have sold his house and made plans to move his family if he had thought he could continue at Miami. Mr. Harker told Mr. Brockelbank he would need to consult a lawyer because he felt he had been mistreated by Miami. Mr. Brockelbank expressed disapproval of Mr. Harker's desire to consult a lawyer.

55.     Mr. Harker was deeply upset by Mr. Brockelbank's duplicity and Miami's treatment of him, so he saw his physician. Mr. Harker's physician took Mr. Harker off work.

56.     On June 16, 2017, Mr. Harker's assistant, Luke Kelly, announced on social media that he had been given Mr. Harker's title of Head Strength and Conditioning Coach at Miami.

10

57.    Thereafter, Mr. Brockelbank and Mr. Harker exchanged several letters and/or emails in which Mr. Brockelbank, through letters drafted for him by Miami's HR department and/or legal counsel, tried to misrepresent the foregoing events to suggest that Mr. Harker was effectively resigning.  Ultimately, Mr. Harker refused to resign and made it clear that his employment had been involuntarily terminated by Miami University.

58.    Miami's Department of Human Resources was well aware of Mr. Harker's exchanges with Mr. Brockelbank.  Nonetheless, on July 31, 2017, Dawn Fahner (Interim Associate Vice President Human Resources) sent Mr. Harker a letter falsely stating that he had "voluntarily terminated" his employment with Miami.

59.    Mr. Harker's employment with Miami was actually and/or constructively terminated in February 2017 when Coach Martin communicated the Athletic Director's decision to non-renew Mr. Harker's contract and instructed him to find another job.

60.    Mr. Harker followed the instructions issued to him by Coach Martin and sought other employment.  Mr. Harker eventually secured replacement employment that pays substantially less than his former position at Miami.

61.    Miami and the other defendants violated Mr. Harker's rights under the Family Care provisions of the FMLA in February 2017 when he was told to find another job because his contract would not be renewed when it expired in June 2017.  Miami's subsequent efforts to deny that this occurred, despite clear confirmation in internal e-mails that the decision to terminate Mr. Harker had been made, and to pretend that Mr. Harker's employment at Miami could continue after he had sold his home and arranged to move, do not undo the violation of federal law.

62.    Mr. Harker also asserts alternatively that his unlawful termination violated applicable provisions of Title VII of the Civil Rights Act of 1964 and/or the Pregnancy

11

Discrimination Act, as amended. Specifically, Mr. Harker alleges that his discharge was unlawfully based on his gender because Coach Martin and other Defendants object to men using FMLA leave to care for their newborn children and wives – as indicated by Coach Martin's statement that all the other men on his staff had returned to work the day after the birth of a child – such that Mr. Harker was treated differently from similarly situated women, and that Mr. Harker was discriminated against due to his wife's pregnancy.

63. As a direct and proximate result of the foregoing unlawful acts, Mr. Harker has suffered and will continue to suffer in the future significant wage loss and other economic damages. Moreover, Mr. Harker has and will continue to suffer loss of future opportunities and diminishment of his professional stature as a direct and proximate result of defendants' unlawful conduct.

## V.  STATEMENT OF CLAIMS

### COUNT I

### Denial of FMLA Rights – 29 U.S.C. § 2615(a)(1)
### (ALL DEFENDANTS)

64.  Plaintiff reiterates and incorporates by reference all above paragraphs as if fully rewritten herein.

65. An employer that takes an adverse employment action based, in whole or in part, on the fact that the employee took FMLA-protected leave has denied the employee a benefit to which he is entitled in violation of 29 U.S.C. § 2615(a)(1).

66. Mr. Harker took leave to which he was entitled under the Family Care provision of the FMLA (i.e., 29 U.S.C. §§ 2612(a)(1)(A)-(C)).

67. Direct and circumstantial evidence establishes that Coach Martin and other defendants sought and obtained the termination of Mr. Harker's employment because he took

FMLA leave under the Family Care provisions of the FMLA, including but not limited to Coach Martin's statements objecting to Mr. Harker's use of leave (i.e., every other man who had ever worked for him was back to work the day after their wife gave birth, and that Mr. Harker would have to decide whether he was a football coach or a family man, etc.), Mr. Harker's "commitment to the program" was questioned while he was on FMLA leave, Mr. Harker was told his future at Miami was in jeopardy while on FMLA leave, and within days after returning from FMLA leave he was told to find another job as quickly as possible because his contract would not be renewed.

68.    Defendants took adverse employment actions against Mr. Harker for his use of leave pursuant to the Family Care provision of the FMLA, thereby violating 29 U.S.C. § 2615(a)(1).

69.    As a direct and proximate result of defendants' conduct, Mr. Harker suffered damages, including without limitation loss of pay and benefits, loss of professional reputation and opportunity, deprivation of an opportunity for employment at Miami, harm to his name and reputation, and emotional distress, humiliation and embarrassment.

## COUNT II

### Retaliation – 29 U.S.C. § 2615(a)(2)
### (ALL DEFENDANTS)

70.    Plaintiff reiterates and incorporates by reference all above paragraphs as if fully rewritten herein.

71.    An employer that retaliates against an employee for exercising rights protected by the FMLA, including without limitation the use of FMLA leave, violates 29 U.S.C. § 2615(a)(2).

72.    Mr. Harker engaged in activity protected by the FMLA.  Specifically, he took FMLA leave pursuant to the Family Care provision of the FMLA.

73.    Miami and the other defendants were aware that Mr. Harker engaged in activity

13

protected by the FMLA.

74.     After learning of Mr. Harker's protected activity, Miami and the other defendants took adverse employment actions against Mr. Harker, including but not limited to the actual and/or constructive discharge of his employment.

75.     Direct and circumstantial evidence establishes that there was a causal connection between Mr. Harker's protected activity and the termination of his employment, including but not limited to Coach Martin's statements objecting to Mr. Harker's use of leave (i.e., every other man who had ever worked for him was back to work the day after their wife gave birth, and that Mr. Harker would have to decide whether he was a football coach or a family man, etc.), Mr. Harker's "commitment to the program" was questioned while he was on FMLA leave, Mr. Harker was told his future at Miami was in jeopardy while on FMLA leave, and within days after returning from leave he was told to find another job as quickly as possible because his contract would not be renewed.

76.     The retaliation against Mr. Harker was a willful violation of 29 U.S.C. § 2615(a)(2).

77.     As a direct and proximate result of defendants' conduct, Mr. Harker suffered damages, including without limitation loss of pay and benefits, loss of professional reputation and opportunity, deprivation of an opportunity for employment at Miami, harm to his name and reputation, and emotional distress, humiliation and embarrassment.

## COUNT III

### Sex & Pregnancy Discrimination –
### 42 U.S.C. §§ 2000e-2(a)(1) and as amended by 42 U.S.C. 2000e(k)
### (DEFENDANT MIAMI)

78.     Plaintiff reiterates and incorporates by reference all above paragraphs as if fully rewritten herein.

14

79.    Mr. Harker filed a timely charge of discrimination with the U.S. Equal Employment Opportunity Commission, EEOC Charge No. 473-2018-00245, alleging discrimination on the basis of sex and/or pregnancy in violation of Title VII of the Civil Rights Act of 1964 and the Pregnancy Discrimination Act.  A copy of said charge is attached as Exhibit F.

80.    On December 15, 2017, the EEOC issued a Dismissal and Notice of Rights to Mr. Harker with respect to EEOC Charge No. 473-2018-00245.  A copy of said Dismissal and Notice of Rights is attached as Exhibit G.  This First Amended Complaint is filed within 90 days of Mr. Harker's receipt of said Dismissal and Notice of Rights.

81.    Coach Martin objected to Mr. Harker's use of leave to care for his wife and newborn twins stating that every other man who worked for him had returned to work the day after a child was born.

82.    Coach Martin's statement evinces discriminatory animus based on Mr. Harker's sex and/or his association with his pregnant wife.  Coach Martin's expectations and requirements for male employees are different and less favorable than for female employees and reflect an outdated gender stereotype that caring for family is "women's work."  Coach Martin's gender-based discriminatory attitude, and actions based on gender stereotyping, caused Mr. Harker's employment to be terminated and/or constructively discharged.

83.    Upon information and belief, Mr. Harker was treated less favorably than similarly situated women.

84.    Mr. Harker was subjected to unlawful employment discrimination based on his sex and/or his wife's pregnancy by Defendant Miami University in violation of 42 U.S.C. § 2000e-2(a)(1) and as amended by 42 U.S.C. § 2000e-(k).

85.    As a direct and proximate result of Miami University's unlawful discrimination,

15

Mr. Harker has suffered damages, including without limitation loss of pay and benefits, loss of professional reputation and opportunity, deprivation of an opportunity for employment at Miami, harm to his name and reputation, and emotional distress, humiliation and embarrassment.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff Paul Harker demands judgment against the defendants as follows:

1. Judgment awarding plaintiff the value of his lost back pay and benefits in an amount to be determined by the evidence at trial;

2. Judgment awarding plaintiff front pay in an amount to be determined by the evidence at trial;

3. Judgment awarding plaintiff liquidated damages;

4. Judgment awarding plaintiff all amounts available under 29 U.S.C. § 2617;

5. Judgment awarding plaintiff compensatory damages for damage to his professional reputation and the loss of future economic opportunities;

6. Declaratory relief holding that the defendants violated plaintiff's statutorily protected rights;

7. Appropriate equitable relief based on the facts and circumstances adduced at trial;

8. Compensatory and punitive damages pursuant to 42 U.S.C. § 1981a;

9. Judgment awarding plaintiff his reasonable attorney fees and costs in this matter; and

10. Judgment awarding plaintiff such other relief in law and equity to which he is entitled under the premises.

Respectfully submitted,

**MINNILLO & JENKINS Co., LPA**

*s/ Christian A. Jenkins*
Christian A. Jenkins (0070674)
Robb S. Stokar (0091330)
2712 Observatory Avenue
Cincinnati, Ohio 45208
Tel:  (513) 723-1600
Fax:  (513) 723-1620
cjenkins@minnillojenkins.com
rstokar@minnillojenkins.com
*Trial Counsel for Plaintiff Paul Harker*

## JURY DEMAND

Plaintiff hereby demands that all issues of fact in the forgoing Amended Complaint be tried to a jury.

*s/ Christian A. Jenkins*
Christian A. Jenkins (0070674)

17

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing was electronically filed with the Clerk of Courts using the CM/ECF system on March 2, 2018, which will send notification of such filing to all counsel of record.

*s/ Christian A. Jenkins*
Christian A. Jenkins (0070674)